FILED

2021 Mar-31 PM 02:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **HUGH THOMAS TULLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | |
| | ) | _____ |
| **THE PRUDENTIAL** | ) | |
| **INSURANCE COMPANY OF** | ) | |
| **AMERICA,** | ) | |
| | ) | |
| **Defendant.** | | |

## COMPLAINT

**COMES NOW**, the Plaintiff, Hugh Thomas Tully, and in support of his Complaint says as follows:

## FACTS COMMON TO ALL COUNTS

1. The Plaintiff is a resident of Shelby County, Alabama.

2. The Defendant, The Prudential Insurance Company of America (hereafter "Prudential"), is, upon information and belief, a foreign corporation that does business by agent or otherwise in the State of Alabama and provided a long-term disability policy of insurance for employees of O'Neal Industries, Inc., at all times relevant to this Complaint.

3.      The Plaintiff worked for O'Neal Industries, Inc. for almost thirty (30) years. During his employment with the company, he matriculated to the position of Director of Indirect Taxes.

4.      The Plaintiff was a participant in a long-term disability plan, which was underwritten by the Defendant.

5.      The Defendant does business by agent in the Northern District of Alabama and all other counties in the State of Alabama.

6.      The Plaintiff's job required him to manage sales and use tax, business license, annual reporting and unclaimed property functions in a multi-corporation, multi-subsidiary, and multi-state environment.

7.      His job was very demanding and fast-paced, requiring him to work approximately ten (10) to twelve (12) hours a day, approximately five (5) days a week.

8.      The Plaintiff's job also required frequent/extensive travel (to conduct audits) and other, light to sedentary physical demand duties. Due to being required to complete a significant amount of paperwork, the Plaintiff also spent significant time working on the computer.

9.      Approximately ten (10) years prior to the Plaintiff becoming disabled, he developed a burning sensation in his feet while on a skiing trip. The Plaintiff thought he had hurt himself while skiing.

10.     Because his pain continued after he returned home, the Plaintiff sought medical treatment. He was misdiagnosed with plantar fasciitis. Over the next five (5) years, the Plaintiff attempted different treatment modalities which proved unsuccessful in relieving his foot pain. The burning sensations and numbness in his feet worsened.

11.     Eventually, he consulted a neurologist who accurately diagnosed the Plaintiff with polyneuropathy.  His condition began to respond to treatment and the Plaintiff continued working over the next five (5) years while remaining under the care of his neurologist. Gradually, however, due to being on his feet day in and day out, the Plaintiff's pain worsened. During this period, the Plaintiff underwent several adjustments/increases to his medication.

12.     Around 2018, the Plaintiff's pain began interfering significantly with his work.  He was distracted and unable to focus on work-related tasks. His hands were numb and tingly, making typing difficult.

13.     The Plaintiff had been accustomed to spending evenings after work doing yard work. However, as his condition worsened, making work difficult, he was forced to start resting in the evenings to be able to return to work the following day.

14.     Eventually, the Plaintiff's evening rest periods were insufficient to allow him enough recuperation to return to work the following day.  The Plaintiff began making mistakes at work, which his supervisor also noticed.

15.     Therefore, he was forced to take leave from work around March 2018.  His short-term disability claim was approved by third party administer acting on behalf of his employer. The Plaintiff's employer paid benefits to him for the maximum benefit period of the short-term disability plan.

16.     While off from work, the Plaintiff continued his treatment. He consulted with his neurologist regarding adjustments to his medications, hoping to find a more suitable regimen to enable him to return to work.

17.     After remaining off work for a while, the Plaintiff began to feel better. His pain decreased and he regained mental clarity.  By the end of the year, the Plaintiff felt well enough to return to work.

18.     Therefore, he asked his neurologist to release him to return to his job.

19.     His neurologist agreed and the Plaintiff returned to his job, initially working reduced hours. Before he could adjust to this schedule, however, the Plaintiff's employer required him to return to his previous, full-time work schedule.

20.     Unfortunately, the Plaintiff's condition began to decline almost immediately after his work schedule was increased to full-time hours.  Within a short period, he found himself in the same situation as before he took leave in March 2018.

21.     The Plaintiff began dreading work again and his anxiety and depression worsened.  The Plaintiff's workdays seemed much longer because he struggled more to make it through an entire workday.

22.    By March 2019, approximately three (3) months after his return to work, the Plaintiff was forced to stop working altogether.

23.    He submitted another claim for short-term disability benefits, which was approved again and paid by his employer for the maximum benefit period.

24.    At the end of the short-term disability period, the Plaintiff's condition had not improved. He continued to suffer severe pain and cognitive deficits.

25.    Therefore, he submitted a claim for long-term disability benefits to Prudential. Prudential approved the Plaintiff's claim beginning September 7, 2019.

26.    In a short period after approving the Plaintiff's long-term disability claim, Prudential began conducting an ongoing review of his claim, which lasted approximately nine (9) to ten (10) months, until Prudential decided to terminate the Plaintiff's benefits in September 2020.

27.    In the denial letter, Prudential stated that its decision was based on opinions by its physician consultant. Specifically, Prudential's physician consultant wrongly stated that the Plaintiff noted his cognition was not a concern when, in fact, the Plaintiff stated that his cognition was not a concern since he was no longer working.

28.    Also, Prudential's physician consultant stated that the Plaintiff's pain was not incapacitating, therefore, he could stand/walk occasionally and sit, making work feasible.

29.     Prudential falsely claimed that the Plaintiff's neurologist suggested that he undergo neuropsychological testing. Specifically, Prudential stated the following: "Dr. King stated that he was not aware of any medication side effects relating to memory issues and suggested that you undergo neuropsychological testing."

30.     However, as reflected in a statement signed by Dr. King on July 28, 2020, he noted the following: "I don't recall having a conversation with Mr. Tully that Gabapentin was not potentially causing his memory loss as your correspondence above states. I have not ordered any formal neuropsychological testing to evaluate his cognition."

31.     Dr. King explained further the following regarding the Plaintiff: "He was on disability prior to my initial visit and my understanding of his disability was from a pain standpoint.  I would defer his pain control and level of disability to his Pain Management Physician.  If formal cognitive testing is needed I can facilitate this order."

32.     In a note from a telemedicine visit with the Plaintiff, Dr. King also noted the following: "He called back stating that Prudential has been on his case about going back to work. My last note indicated that things were "manageable" on his current regimen but I by no means wanted this to indicate his pain had resolved and there were no further ailments. . ."

33.     Dr. King also stated: "Neuropathy is an incurable condition and the treatment is focused on trying to lessen his pain. He has tried a variety of treatments and feels currently that the regimen he is on is beneficial. This does not mean he is cured."

34.     Prudential noted sending a letter to the Plaintiff's pain management physician, regarding his functional capacity, to which his physician suggested that the Plaintiff undergo a functional capacity evaluation (FCE).

35.     Despite issues arising regarding the Plaintiff undergoing a neuropsychological evaluation and an FCE, Prudential did not request the Plaintiff undergo either of these evaluations (prior to terminating his claim), to gain further insight regarding his restrictions and limitations.

36.     Instead, it waited until the Plaintiff appealed its termination of his claim and, despite the Plaintiff submitting findings from an Independent Medical Evaluation (IME) confirming he lacked the capacity to work, Prudential requested that he undergo a neuropsychological evaluation, which it scheduled after the time for a decision of his appeal had already passed.

37.     The Plaintiff submitted his appeal to Prudential on January 5, 2021 and Prudential scheduled his neuropsychological evaluation for March 22, 2021, well past the 45-day deadline to decide his appeal and without providing a sufficient basis to extend the decision.

38.     In his appeal, the Plaintiff pointed out Prudential's failure and refusal to acknowledge the severity of his pain, despite his medical history of being misdiagnosed and receiving the wrong treatment for several years. Furthermore, the Plaintiff was noted to suffer from debilitating pain.

39.     The Plaintiff's medical records are replete with notations regarding the severity of his pain and his multiple medication adjustments geared toward trying to relieve/improve his pain. In his appeal, the Plaintiff referenced the specific information from his medical records which documented such.

40.     The Plaintiff also submitted a pain journal in support of his appeal, reflecting his daily struggles with pain. In his journal, the Plaintiff repeatedly noted tingling and numbness in his hands and feet, loss of balance, and burning sensations, pain, and stiffness in his feet.

41.     Prior to its termination of his claim, the Plaintiff explained to the claims adjuster repeatedly the severity of his ongoing pain, despite having a pain stimulator. He told the adjuster that his stimulator improved his pain, but his pain remained chronic and severe. However, the adjuster ignored the Plaintiff and instead, expressed his desire that the Plaintiff's doctor change his medications to prevent adverse side effects and enable the Plaintiff to return to work.

42.     During the entire nine (9) to ten (10) months Prudential reviewed the Plaintiff's claim, he felt threatened and harassed by the claims adjuster, who

continued to request the same information from him which he had already provided. The Plaintiff's monthly disability payments were delayed due to Prudential's repeated requests for updated medical information after every doctor's visit. The information from the visits continued to reflect that the Plaintiff's condition remained essentially the same.

43.     Despite the Plaintiff noting on an Activities of Daily Living form he submitted to Prudential, that his wife or daughter had to drive him after he took his medications, and his limited ability to engage in household chores (i.e., twice a week), Prudential's physician consultant stated that the Plaintiff's ability to drive and perform household chores supported his ability to work.

44.     On the same form, the also noted that he suffered from constant and severe pain and burning in his feet, numbness and tingling in his hands, memory loss and confusion from medication and depression, and constant mental stress due to his pain.  He stated that he was constantly sleepy and required naps, which he never took previously.

45.     In its review, Prudential obtained information from the Plaintiff's Facebook account, including his advertisement for someone to assist with yardwork, specifically, blowing leaves and grass, cutting edges, putting out pine bark, and handling other landscaping duties. This information further confirmed the Plaintiff's restrictions and limitations.

46.     The Plaintiff also noted in his appeal eight (8) specifically documented instances noting his adverse medication side effects, including sedation, feelings like a 'zombie,' and jerks. He also noted further comments by his neurologist, indicating that the Plaintiff's memory deficits and cognitive slowing was not surprising, given his prescriptions for Gabapentin and Oxcarbazepine.

47.     The Plaintiff underwent an Independent Medical Examination (IME) on December 18, 2020 by occupational medicine physician, Robert L. Ross, III, M.D., MPH.  The Plaintiff's examination results included the following abnormal findings: ataxic gait, mild cerebellar signs, slurred speech, and emotional lability.

48.     Dr. Ross confirmed the following supported impairments suffered by the Plaintiff based on his review of the medical records and his examination of the Plaintiff:   idiopathic polyneuropathy, chronic pain, gait imbalance, anxiety, depression, chronic pain, and adverse medication side effects.

49.     Dr. Ross also noted his clinical observations of the Plaintiff during the IME, which included times the Plaintiff appeared to be in a 'fog', confused, and unable to remember things.  Dr. Ross noted that the Plaintiff's presentation was of someone suffering from a complex neurological impairment involving cognitive and physical complications/dysfunction of the central nervous system.

50.     Based on the Plaintiff's medical history and IME results, Dr. Ross concluded he remained unable to work, specifically due to erosion of his higher order executive

functionality and his chronic, debilitating pain. Dr. Ross confirmed that the Plaintiff would continue to require flexibility, specifically, rest periods during the day, making it unfeasible for him to meet the demands of full-time employment, particularly with respect to his previous job.

51.     In addition to submitting Dr. Ross' IME findings in further support of his appeal, the Plaintiff also submitted a picture of his feet to Prudential, which showed the very bright red color often associated with burning and tingling sensations, as well as temperature changes caused by neuropathy.

52.     Despite the issues raised by the Plaintiff in his appeal and the supporting evidence he submitted with his appeal, especially his recent IME results, Prudential obtained adverse medical opinions from Tatyana Gitlevich, M.D.

53.     In her report, Dr. Gitlevich wrongly concluded that the Plaintiff's previous job was sedentary. Prudential was aware that the Plaintiff frequently traveled for his job, which meant his job was considered 'light' duty work.  There is no indication that Prudential corrected Dr. Gitlevich regarding this issue.

54.     Dr. Gitlevich failed to acknowledge that, regardless of the physical demand level associated with the Plaintiff's job, his pain made it impossible for him to return to work due to the distracting and debilitating nature of it.

55.    She also failed to acknowledge that, while walking and standing increases the Plaintiff's pain, it is not the source of his pain. Rather, his disease is the source of his pain, and, even when sitting, the Plaintiff's pain is severe.

56.    Dr. Ross pointed this out in a supplemental declaration submitted in response to Dr. Gitlevich's opinions. As well, he pointed out repeated references to the Plaintiff's pain in the medical records and consistent pain noted in the Plaintiff's pain journal.

57.    In response to Dr. Gitlevich's notation that the Plaintiff was not noted to use an assistive device, Dr. Ross explained that use of an assistive device is not a medically supported standard for disability.

58.    Furthermore, contrary to Dr. Gitlevich's assertion, the Plaintiff noted his use of a cane and motorized cart at times.

59.    Dr. Gitlevich also wrongly characterized the Plaintiff as a chronic alcohol user (with an alcohol dependency), even though he was noted to use alcohol moderately. She also attributed the Plaintiff's alcohol use to his neuropathy, despite no indication by his doctors of such.

60.    The Plaintiff submitted a supplemental declaration explaining further the frequency of his alcohol.  Specifically, he stated that before COVID, he went out to dinner with friends approximately once a month. He usually drank beer during these

outings and sometimes at home, which amounted to six (6) to eight (8) beers per month.

61.    After his monthly dinners with friends ceased due to COVID, the Plaintiff noted drinking about three (3) to five (5) beers per month.

62.    In addition to the Plaintiff's statements of drinking a few beers per month, Dr. Ross also confirmed that moderate use of alcohol is not a cause of neuropathy and, in fact, there must be significant alcohol misuse for it to contribute to this condition.

63.    He pointed out further Dr. Gitlevich's failure to consider the probable genetic source of the Plaintiff's diagnosis, given his mother's medical history.

64.    In response to Dr. Gitlevich's statement that Dr. Ross' notation of cerebellar signs regarding the Plaintiff could not be explained for reasons other than alcohol use, Dr. Ross pointed out that ataxia is, indeed, a cerebellar sign. He also reiterated information contained in his report, regarding his own clinical observations of the Plaintiff's cognitive deficits, which are support for cerebellar signs.

65.    Like the Plaintiff's neurologist, Dr. Ross pointed out that sensory polyneuropathy is a progressive, incurable disease with ongoing symptoms. Therefore, he noted the unsupportable basis of Dr. Gitlevich's opinion that restrictions and limitations would apply for only six (6) months.

66.    In addition to characterizing the Plaintiff as a chronic/dependent alcohol user with no credible basis for doing so, Dr. Gitlevich also stated that he operated heavy

machinery due to the use of his riding lawnmower. Despite this endeavor only requiring the Plaintiff to insert a key and start the engine, Dr. Gitlevich characterized lawnmower riding the same as someone operating a forklift, crane, or bulldozer.

67.    Despite factual inaccuracies in her report, upon which she based her opinions and essentially ignored the physical limitations suffered by the Plaintiff due to his disease, Dr. Gitlevich insisted that the Plaintiff should undergo a neuropsychological evaluation.

68.    Dr. Ross noted his concern with Dr. Gitlevich's insistence that the Plaintiff undergo such an evaluation, given her minimization of some of the primary reasons for his disability.

69.    He also noted his surprise by Dr. Gitlevich's attempt to discredit the Plaintiff without ever having met him and, also, given the Plaintiff's almost thirty (30) year work history with the same company, and the significant demands of his job as an Indirect Sales Tax Director.

70.    After the Plaintiff submitted a letter dated February 18, 2021, along with his signed supplemental declaration, as well as a signed supplemental declaration from Dr. Ross, requesting a response from Prudential to the issues raised about Dr. Gitlevich's medical review, Prudential responded via a letter dated February 25, 2021, advising the Plaintiff that a neuropsychological evaluation had been set up for

him on March 22, 2021. Prudential did not respond to the issues raised by the Plaintiff regarding Dr. Gitlevich's review.

71.    To expedite the evaluation due to his financial situation, the Plaintiff obtained an earlier date to undergo the evaluation, which was conducted on March 3, 2021.

72.    On March 17, 2021, he submitted the report of his neuropsychological evaluation, which confirmed abnormal cognitive findings, noted to be the likely result of adverse medication side effects.

73.    In his report, the neuropsychologist noted that the Plaintiff appeared antsy and jittery during the interview and testing, and that he was unsteady on his feet. He also noted the Plaintiff's difficulty understanding test instructions, at times requiring that the instructions be repeated for purposes of comprehension.

74.    After submission of the report, instead of moving forward with a decision of the Plaintiff's appeal, given that it was well past the 45-day deadline, Prudential then requested that the Plaintiff sign an authorization for release of the raw data from his neuropsychological evaluation.

75.    Had the Plaintiff undergone the neuropsychological evaluation Prudential scheduled for him on March 22, 2021, and such evaluation yielded adverse opinions, the Plaintiff would have been entitled according to the claim procedure regulations to respond to the opinions within 21 days. Given this, the Plaintiff's response would have been well past even a 45-day extension of the appeal decision.

76.     During the appeal review, Prudential did not provide reasons noting circumstances beyond its control for why it delayed obtaining the medical information it sought.

77.     It also did not provide the Plaintiff with a copy of Dr. Gitlevich's medical review (and the opportunity for the Plaintiff to promptly respond within 21 days), until the Plaintiff inquired about the basis for Prudential's request for him to undergo a neuropsychological evaluation.

78.     In response to the Plaintiff's inquiry, Prudential provided the medical review, which was the first time the Plaintiff was made aware that these adverse medical opinions existed. The Plaintiff pointed out to Prudential that he had a right to respond to this information per the claim procedure regulations.

79.     The medical review report reflected the date of January 21, 2021. Had the Plaintiff received the report this date, his response would have been due by February 12, 2021. However, it was not received by the Plaintiff until February 2, 2021, after he inquired why Prudential was requesting that he undergo a neuropsychological evaluation.

80.     Dr. Gitlevich indicated her belief that the Plaintiff should undergo a neuropsychological evaluation. However, the Plaintiff's neurologist stated, (prior to Prudential's termination of the claim), that he would assist with efforts to obtain a neuropsychological evaluation of the Plaintiff if such was deemed necessary. There

are no indications that Prudential sought to obtain a neuropsychological evaluation of the Plaintiff prior to terminating his claim.

81.     Rather, after the Plaintiff submitted his appeal, along with IME findings supportive of his ongoing disability, Prudential then requested that he undergo such an evaluation.

82.     The entire claims handling process by Prudential, from shortly after it approved the Plaintiff's long-term disability claim to the present, has been adversarial and a show of unfair gamesmanship.

83.     The Plaintiff's efforts to explain to Prudential the nature and limitations of his condition have continued to be ignored, and Prudential has chosen to continue to require that the Plaintiff facilitates its efforts to gather further adverse evidence to support its decision to terminate his claim.

84.     The Social Security Administration found the Plaintiff disabled from any occupation as of March 11, 2019.

85.     Prudential's policy requires that the Plaintiff be disabled from his previous occupation only for his claim to be paid.

86.     Prudential failed to show improvement in the Plaintiff's condition, (since the inception of his disability), sufficient to allow him to return to work.

87.     Prudential also failed to state why the Plaintiff's extensive medical history and the medical evidence, (which included repeated abnormal neurological examinations), was insufficient to show the debilitating nature of his condition.

88.     Prudential failed to state how the Plaintiff could sustain gainful employment while taking potent medications to try and manage his pain.

89.     It also failed to state how the Plaintiff's ability to concentrate and focus would not be significantly impaired by his ongoing, chronic pain.

90.     Prudential failed to state why the Plaintiff being a fall risk would not be considered by most employers to be a reason not to hire him.

91.     Prudential failed to consider the Plaintiff's efforts to continue working up until he began making mistakes at work, which his employer recognized.

92.     The Plaintiff has exhausted all administrative remedies and/or further efforts by the Plaintiff to exhaust remedies would be futile.

## **COUNT ONE**

93.     The Plaintiff incorporates by reference all previous paragraphs of this Complaint as if set out in full.

94.     This Count is brought regarding the Plaintiff's long-term disability policy under 29 U.S.C. § 1132(a)(1)(B) and seeks to recover benefits, damages, and attorney's fees as may be recoverable under this code provision and 29 U.S.C. § 1132(g). The Plaintiff seeks to enforce his rights under the long-term disability plan

in question.  This plan is an employee benefit plan that appears to be regulated by the Employee Retirement Income Security Act (hereafter ERISA), 29 U.S.C. § 1001 *et seq.*

95.     On or around September 25, 2020, Prudential wrongfully and in violation of its obligations under ERISA denied long-term disability benefits to the Plaintiff. Prudential has continued to deny benefits to the Plaintiff since that time. Prudential has failed to conduct a full and fair review of this claim.

**WHEREFORE,** the Plaintiff demands judgment against Prudential as follows:

(a)     For a *de novo* review of this claim;

(b)     For the sum of all past due long-term disability benefits;

(c)     For reinstatement of the Plaintiff's claim to all present and future long-term disability benefits under the Plan;

(d)     For an award of attorney's fees;

(e)     For interest on all past due benefits;

(f)     For such other further or different relief as may be just and proper under 29 U.S.C. § 1132(a)(1)(B) including surcharge damages as allowed by law.

Ariel S. Blocker
(ASB-0090-Z82A)


Attorney for the Plaintiff
Hugh Thomas Tully
The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL  35402
Ph. (205) 343-1771
Fax (205) 343-1781
ariel@erisacase.com


**Plaintiff's Address:**
Hugh Thomas Tully
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL  35402

**Defendant's Address:**
The Prudential Insurance Company of America
c/o C T Corporation System
Agent for Service of Process
2 North Jackson Street, Suite 605
Montgomery, AL 36104